**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **TERESA GARRISON PRATT,** *et al.*, | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 24-CV-452-GLJ** |
| **CALYX ENERGY III, LLC,** *et al.*, | ) ) | |
| **Defendants.** | ) ) | |

**OPINION AND ORDER**

Before the Court is Plaintiffs' Rule 59(e) Motion to Alter or Amend Judgment and Brief in Support [Docket No. 69]. After considering the parties' briefing on the matter and the applicable caselaw, the motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND AND PROCEDURAL HISTORY**

On July 8, 2024, Plaintiffs Teresa Garrison Pratt, Longreach Energy 2, LLC, and Royfin Natural Gas, LLC, filed this action in the District Court for McIntosh County, Oklahoma, Case No. CJ-2024-79,  on behalf of themselves and all others similarly situated against Defendants Calyx Energy III ("Calyx Energy"), LLC, Calyx Energy III Holdings ("Calyx Holdings"), LLC, Riverside Midstream Partners, LLC ("Riverside Midstream"), Riverside Gathering, LLC ("Riverside Gathering"), and Calvin D. Cahill. Plaintiffs allege Defendants committed fraud by appropriating and concealing revenue derived from or attributable to the production of natural gas from wells located in McIntosh County,

1

Oklahoma, and surrounding counties. Docket No. 2-1, at ¶¶ 15. On November 19, 2024, Defendants removed this action to this Court. Docket No. 2.

Plaintiffs and the putative class own interests in oil and gas wells located in McIntosh County, Oklahoma, and the surrounding counties ("Class Wells"). Docket No. 45, at ¶ 19. Defendant Cahill obtained the rights to drill and operate oil and gas wells in these counties vis-à-vis Calyx Investments, Calyx Holdings, and Calyx Energy. Docket No. 45, at ¶ 17. In 2016 Defendant Cahill, through Calyx Energy, entered a contract with Enable Gathering and Processing, LLC ("Enable") for gas gathering and processing services ("Enable Contract"). Docket No. 45, at ¶¶ 21. Pursuant to the Enable Contract, Enable performed midstream services at standard rates. Docket No. 45, at ¶ 22.

Defendant Cahill created Riverside Midstream and Riverside Gathering to construct and operate a gathering system for the Class Wells ("Riverside Gathering System."). Docket No. 45, at ¶ 23. While the Riverside Gathering System was being constructed, Defendants contracted with Enable and EnLink Midstream Services, LLC ("EnLink") to provide processing services. Docket No. 45, at ¶ 25. On or about August 25, 2017, Defendants Riverside Midstream and Riverside Gathering executed an Asset Purchase and Sale Agreement ("PSA") with Tall Oak Woodford, LLC ("Tall Oak"), and Defendant Calyx Energy executed a Gas Gathering and Processing Agreement ("GGPA") with Tall Oak. Docket No. 45, at ¶¶ 30-24. Under the terms of the GGPA between Calyx Energy and Tall Oak, Calyx Energy agreed not to extend or renew its agreements with Enable or EnLink, and upon completion of the construction of the Panther Creek Processing Plant,

2

Calyx would "dedicate" gas from the Class Wells solely to Tall Oak, despite the Riverside Gathering System being owned by "Defendant Riverside." Docket No. 45, at ¶¶ 44-48.

Pursuant to the terms of the PSA, Riverside Midstream and Riverside Gathering agreed to sell, *inter alia*, the Riverside Gathering System to Tall Oak and agreed that Calyx Energy, a non-party to the PSA, would divert natural gas production away from Enable and Enlink. Docket Nos. 57 & 45 at ¶¶ 35-36.  In return, Tall Oak was to pay "earnouts" calculated in part based on the diverted natural gas production to Cahill, Riverside, Calyx Investments, and/or Calyx Holdings. Docket No. 45, at ¶¶ 35-36.

On July 15, 2025, Plaintiffs filed an Amended Complaint alleging six causes of action claiming an entitlement to the earnouts. Docket No. 45. Defendants moved to dismiss Plaintiffs' Amended Complaint and this Court granted the motion, dismissed all of Plaintiffs' claims, and entered judgment in favor of Defendants. Docket No. 67 & 68. Plaintiffs now move, pursuant to Fed. R. Civ. P. 59(e), to alter or amend the judgment or, alternatively, for leave to file second amended complaint. For the reasons stated below the Court finds that the motion should be GRANTED IN PART, to the extent it requests leave to amend, and DENIED IN PART to the extent it requests relief under Rule 59(e).

## LEGAL STANDARD

A motion to reconsider under Rule 59(e) "is designed to permit relief in extraordinary circumstances and not to offer a second bite at the proverbial apple." *Syntroleum Corp. v. Fletcher Int'l ltd.*, 2009 WL 761322, at *1 (N.D. Okla. Mar. 19, 2009) (internal citations omitted). "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and

3

(3) the need to correct clear error or prevent manifest injustice. Thus, a motion for reconsideration is appropriate when the court has misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (Citations omitted). A motion to reconsider is not a means "to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Id.* Plaintiffs argue that the Court misapprehended facts or argument in (1) finding the Amended Complaint did not allege gas from the Class Wells was sold, (2) treating one phrase from one lease clause as reflective of all leases, and (3) concluding Plaintiffs failed to allege that the non-standard terms of the PSA and GGPA reduced their royalties.

## ANALYSIS

### I.    Leases

Because the relevant leases create the entitlement to royalties—not the PRSA—the Court begins its analysis with Plaintiffs' argument that the Court misapprehended the leases. *Cline v. Sunoco, Inc.* 159 F.4th 1171, 1203-04 (10th Cir. 2025) ("In *Purcell*, the Oklahoma Supreme Court held that a PRSA violation 'is based upon a breach of the obligation to pay the royalty arising *ex contractu* in the manner prescribed by [the PRSA].'") (alterations in original); *Foster v. Apache Corp.*, 285 F.R.D. 632, 641 (W.D. Okla. Aug. 20, 2013) ("[T]he lessee's obligations to the mineral owners are determined largely by the terms of the oil and gas lease."). Plaintiffs assert that the Court misapprehends the lease royalty language by treating one lease clause as dispositive of all leases and by not analyzing the "value received" or "used off the lease" royalty clauses.

On November 26, 2024, Defendants filed a Motion to Dismiss Plaintiff's Petition ("First Motion to Dismiss"). Docket No. 21. Defendants argued, *inter alia*, that the Petition did "not state a legal claim to the earnout." *Id.* at p. 8. Particularly, Defendants asserted that their duty to pay royalties can "only arise as a result of lease terms as between lessors and their lessees[, and] . . . Plaintiffs fail[ed] to allege the terms of any lease in their Petition[.]" *Id.* at pp. 8-9 (citing *Purcell v. Santa Fe Mins. Inc.*, 1998 OK 45, ¶¶ 20-22, 961 P.2d 188, 193-94). On February 17, 2025, Plaintiffs moved to file a first amended complaint seeking to remove allegations against RoyFin Natural Gas, LLC, "attach Plaintiffs' relevant oil and gas leases to the First Amended Complaint and incorporate those leases into the pleading[,]" and "clarify allegations about the earnout payments that Defendants received under the PSA." Docket No. 34, at pp. 3-4. This motion was granted, and the First Amended Complaint was filed on July 15, 2025. Docket Nos. 44 & 45.

Defendants filed a Motion to Dismiss Plaintiffs' Amended Class-Action Complaint ("Second Motion to Dismiss") on July 29, 2025, maintaining that the First Amended Complaint failed to establish "Plaintiffs' entitlement to a share of the [earnouts] in the absence of a contract establishing such right[.]" Docket No. 56, at p. 1; *Id.* at p. 8 ("Plaintiffs failed to satisfy the foundational element required for both (1) entitlement to royalties on the Purchase Price Component; and (2) application of the PRSA. Plaintiffs have not provided this Court with a single lease term that arguably provides for royalties on the specific type of monies at issue—the Purchase Price Component."). More specifically, Defendants argued despite leases being attached to the First Amended Complaint, the First Amended Complaint never argued or mentioned the leases and did not

5

allege "any facts to even suggest that the limiting language of each lease allegedly entitles each Plaintiff to a 'royalty share' of any part of the [earnouts]." *Id.* at 7. In response, Plaintiffs argued they "need not rely on specific lease language when the PRSA creates a statutory right on an issue." Docket No. 65, at p. 13. On December 18, 2025, the Court granted Defendants' Second Motion to Dismiss finding the First Amended Complaint failed to allege an entitlement to the earnouts. This Court declined to grant Defendants' motion to the extent it urged the Court to dismiss Plaintiffs' claims for failing to explicitly allege that the leases attached to the First Amended Complaint created any agreement between Plaintiffs and Defendants because it was clear there existed "leases between Plaintiffs and Calyx Energy which entitle Plaintiffs to royalties[.]" Docket No. 67, at p. 5.

However, this Court found Plaintiffs' contention that they need not rely on the leases to establish an entitlement to the earnouts unpersuasive. Docket No. 67, at pp. 7-11. Despite Plaintiffs' failure to cite *any* lease language or explain how they believed any of the royalty clauses entitled them to a portion of the earnouts, the Court proceeded to review a representative sample of the leases attached to the First Amended Complaint to ensure it was not apparent on the faces of the leases that the earnouts would be royalty bearing. In doing so, the Court found many, albeit not all, leases constituted "production-type" leases akin to those at issue in *Watts v. Atl. Richfield Co.*, 115 F.3d 785 (10th Cir. 1997) wherein the "lessee [was] not obligated to pay a royalty on the value of gas in the abstract, but only on the cash value of gas that is actually produced *and sold* from the leased property." 115 F.3d at 791 (emphasis added).

6

Plaintiffs now, after claiming they "need not rely on specific lease language" fault the Court for (1) not analyzing the first lease attached to the First Amended Complaint which requires the lessee to pay lessor "the gross value [of oil, gas, and other matter], based on all value, received by the [l]essee"; and (2)  not accounting for the full language in the royalty clauses in the production-type leases which required payment for gas "produced and sold or used off the lease[d] premises, or used in the manufacture of products therefrom." Docket No. 69, at pp. 10-11. The Court will not consider these arguments as this is the first time Plaintiffs seek to argue the lease language and the facts underlying these arguments were available at the time of both the First and Second Motions to Dismiss. *See Servants of the Paraclete*, 204 F.3d at 1012.

To the extent Plaintiffs maintain that this Court's Order resolved Defendants' Motion to Dismiss the First Amended Complaint on an issue not before it because "[t]he dispute between the parties was **not** about whether the royalty obligations in the subject leases had been triggered as to Plaintiffs' gas but, instead,  whether the earnouts counted as royalty proceeds that were subject to royalty sharing[,]" the pleadings filed in this case reflect otherwise. Docket No. 76, at p. 10 (bold in original). As detailed above and noted by Defendants in their response opposing the present motion, both Defendants' First and Second Motions to Dismiss clearly claimed Plaintiffs failed to cite any lease language entitling them to earnouts. Docket No. 21, at pp. 8-9 (noting that the "lease terms decide the outcome" and that "the existence of a lease is necessary in an action to recover damages calculated in accordance with the PRSA. . . . Because Plaintiffs fail to allege the terms of any lease in their Petition, they have failed to state a claim, under any theory, to the

earnout.") (internal citations and quotations omitted); Docket No. 56, at p. 2-4 ("The Amended Complaint does not contain a single factual allegation that arguably establishes a legal right or entitlement to share in the Purchase Price Component. In the absence of such legal right, there is, and can be, no entitlement to royalties[.] . . . The leases are not in any way discussed or relied upon for Plaintiffs causes of action. Plaintiffs simply attach the purported leases without alleging any facts to even suggest that the limiting language of each lease allegedly entitles each Plaintiff to a 'royalty share' of any part of the Purchase Price Component.").[1] Rather than responding to these arguments by pointing to any lease language, Plaintiffs argued that they "need not rely on specific lease language when the PRSA creates a statutory right." Docket No.  65, at p. 9.

Plaintiffs, upset with this Court's review and interpretation of the leases attached to the First Amended Complaint, complain that the Court , in essence, should have reviewed every single lease, discussed each and every royalty clause contained therein that may be interpreted in their favor, and divined what arguments Plaintiffs may have made in support of their assertion that they are entitled to a portion of the earnouts. The Court is not Plaintiffs' advocate, and it was under no obligation to scour Plaintiffs' First Amended Complaint to identify a plausible argument under the leases. Especially so where Plaintiffs

---

[1] Defendants' reply brief in support of the Second Motion to Dismiss [Docket No. 66] also made it clear Defendants were arguing Plaintiffs failed to allege an entitlement under any of the leases. Under Section I of their reply, titled "The Lease Creates, Defines and Governs Royalty Rights," Defendants argued "none of the approximately 134 pages of purported oil and gas leases attached to Plaintiffs' Amended Complaint are discussed or relied upon for Plaintiffs' causes of action. The complete absence of any factual allegation of a lease that provides a right to a royalty share of the Purchase Price Component is fatal to the Amended Complaint. . . . A contractual right to the monies sought must be established before the distribution mechanism provided by the PRSA can be invoked." Docket No. 66, at pp. 3-4.

themselves made no such effort and disavowed the need to cite any lease language. Plaintiffs had the opportunity to raise any arguments they saw fit, and they chose not to raise any arguments relating to the leases. Because these arguments could have been raised previously, the Court declines to consider these new arguments and set aside or amend its judgment on this basis.

## II.     Gas Produced and Sold

Plaintiffs next maintain the Court's Order was predicated on the mistaken belief that Plaintiffs did not allege gas was produced and sold from the Class Wells. Docket No. 69, at p. 1. In support of this, Plaintiffs point to one paragraph in the Amended Complaint in which they allege "Defendant Calyx Energy, as operator, produced and sold natural gas from these wells." Docket No. 45, at ¶ 18.

It is true Plaintiffs Amended Complaint does allege that gas was produced and sold from the Class Wells and that Plaintiffs maintained as such in their response to the Second Motion to Dismiss. Docket No. 45, at ¶ 18; Docket No. 65, at pp. 4-5. However, as Defendants note, the crux of the issue is whether Plaintiffs' Amended Complaint alleges facts, when taken as true, that entitle Plaintiffs to a portion of the earnouts, *i.e.*, that the earnouts are royalty bearing under the relevant leases. It is in this context that the Court found Plaintiffs Amended Complaint fails to allege that production of natural gas was sold. Docket No. 67, at p. 11 ("[U]nless the earnouts constitute payment for gas, Plaintiffs are not entitled to royalties."); *Id.* at p. 15 ("But without an entitlement to a portion of the earnouts, it remains patently unclear to the Court how, if at all, Defendants were unjustly enriched at Plaintiffs' expense. Indeed, Plaintiffs never allege (i) production was sold *such*

9

*that* they would be entitled to royalties, (ii) the earnouts constitute payment for gas sold, or (iii) the PSA negatively impacted their right to past or future royalties on gas produced, saved, and sold.") (emphasis added).

It is in this respect that Plaintiffs' First Amended Complaint did not sufficiently allege production was *sold* and the earnouts were received as *payment* for said production. In fact, the allegations of the First Amended Complaint never state that the earnouts were paid, as consideration, for gas but instead that the gas was "dedicated" to Tall Oak. Docket No. 45, at ¶ 36 ("Pursuant to the PSA, if Calyx Energy . . . produced and *dedicated* gas to Tall Oak a certain average volume of gas per day during a set time period, Tall Oak was contractually obligated to pay revenue called '[e]arnouts[.]'") (emphasis added); *Id.* at ¶ 28 ("Tall Oak agreed to pay revenue, called 'earnouts,' to Defendants *based* upon the volume of natural gas production from the Class Wells.") (emphasis added); *Id.* at ¶ 15(2) ("Tall Oak promised in exchange to pay revenue to Defendants based upon the volumes of natural gas production that Defendants produced from the class wells and sent *through* the Tall Oak System.") (emphasis added).

Plaintiffs clearly believe that because the earnouts were calculated by referencing gas that was "dedicated" and/or "passed through" Tall Oak, it constituted a sale, or that they are entitled to royalties. But, in response to the Second Motion to Dismiss, Plaintiffs failed to point to any lease language establishing such a right to royalties based on mere "dedication" and/or being "sent through" as opposed to a sale, and the PRSA itself does not create such a right as discussed in this Court's prior Opinion and Order. In short, the

10

fact that gas was sold from the Class Wells is irrelevant if the earnouts were not payment for said sale.

Ultimately, the earnouts were the purchase price for the Riverside Gathering System. Docket No. 45, at ¶ 27. As Plaintiffs allege, the earnouts were "based" on "the volumes of natural gas production that Defendants produced from the class wells and sent through the Tall Oak system." Docket No. 45, at ¶¶ 15(1) & (2).[2] Plaintiffs' First Amended Complaint does not maintain that Defendants paid the earnouts and received gas in return, such that there was a sale of gas. Indeed, from the First Amended Complaint it appears to the Court that the gas, despite being "dedicated" to Tall Oak, was or would be sold either before or after passing through Tall Oak and, at the time of such sale, Plaintiffs received or would receive their portion of royalties. Plaintiffs do not explain now, or in their prior pleadings, why they should be entitled to, not just their royalties, but also what appears to be for all intents and purposes a contract price for the sale of the Riverside Gathering System to Tall Oak that was determined, in part, by referencing gas that was "dedicated" to Tall Oak. The Court finds no misapprehension here warranting reconsideration.

### III.    Reduction in Royalties

Lastly, Plaintiffs argue the judgment should be set aside because the Court mistakenly held that Plaintiffs failed to allege how the terms were non-standard or impacted

---

[2] Naturally, the more gas that passed through the system, the more valuable the system would be as it would result in more midstream services and related fees. Thus, it appears Defendants and Tall Oak came together and agreed that the price of the system would be determined in part, based on the amount of gas that passed through the system. Based on the allegations in the First Amended Complaint, Tall Oak never took "title" of the gas.

their right to royalties. Docket No. 69, at p. 1. In support of this argument Plaintiffs point

to several paragraphs in the First Amended Complaint. These paragraphs provide:

> The Enable contract was a standard midstream services contract, wherein Enable performed midstream services for standard rates. The Enable contract did not provide for any earnout revenue to be paid to Defendants.

> On or around August 2016, Defendants jointly concocted a scheme whereby Defendants agreed to sell the Riverside Gathering System to Tall Oak, agreed to terminate or rescind their existing midstream contracts with Enable and Enlink, agreed to non-standard rates for Tall Oak's services, and promised to dedicate all available production from Class Wells exclusively to Tall Oak for a twenty-year period.

> Defendants negotiated for and executed non-industry standard contracts with Tall Oak. The terms and conditions of the GGPA and PSA were conditioned upon Tall Oak not only performing midstream services, **but also paying revenue to Defendants in the form of "earnouts."** Plaintiffs and the Class were subjected to the non-standard terms under the GGPA and PSA but did not receive any of the PSA revenue derived from such non-standard terms.

> Defendants received earnouts under the PSA based on the natural gas production from the Class Wells. In order to receive such revenue, Defendants collectively committed the Class Wells to the GGPA and PSA— to the exclusion of Enable and Enlink services.

> The GGPA and PSA are not standard midstream contracts and do not contain standard midstream terms. The terms and conditions of the GGPA and PSA were conditioned upon Tall Oak not only performing midstream services, **but also paying revenue to Defendants in the form of "earnouts."**

Docket No. 45, at ¶¶ 22, 27, 115, & 123-125 (bold in original). Plaintiffs contend that these

paragraphs sufficiently allege "harm" such that dismissal was inappropriate because they

believe this Court's Order "effectively required was not an allegation of harm, but an

allegation of **how much harm**." Docket No. 69, at p. 12 (bold in original).

The issue, however, was not whether Plaintiffs alleged harm but whether Plaintiff's

alleged that the non-standard terms reduced Plaintiffs' royalties such that the earnouts may

12

constitute consideration for gas under *Watts v. Atl. Richfield Co.*, 115 F.3d 785 (10th Cir. 1997). Although not entirely on point because it addresses when lessors are entitled to a portion of settlement proceeds under "production-type" leases, *Watts* is nonetheless instructive. In *Watts* the Tenth Circuit indicated where "a lessee accepts a settlement payment in exchange for a reduced future price term, the lessors are entitled to a royalty payment on two components, each of which constitutes consideration for actual production: '(1) the proceeds obtained by the lessee from the sale of gas at the bought-down-price; and (2) a commensurate portion of the settlement proceeds that is attributable to price reductions applicable to future production and under the renegotiated gas sales agreement as production occurs.'" 115 F.3d at 793 (quoting *Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1236 (10th Cir. 1996).

This Court, having found Plaintiffs failed to allege that gas was sold from the Class Wells such that the earnouts were *payment* for said gas, found the first component was not applicable. Docket No. 67, at pp. 12 & 19 ("Plaintiffs do not allege the production of natural gas was sold, the earnouts constitute payment for gas sold, or that the substandard rates/terms that Defendants agreed to resulted in a reduction of any future or past due royalties on gas sold. . . . Plaintiffs never allege in the Amended Complaint or otherwise that (i) oil and gas was sold rather than 'dedicated'' (ii) the relevant leases entitle Plaintiffs to royalties on the earnouts, and (iii) the terms of the PSA negatively impacted their past or future royalties on production sold.").

As it pertains to the second component, the paragraphs of the First Amended Complaint cited by Plaintiffs do not explicitly or implicitly allege that the non-standard

13

terms reduced Plaintiffs' past or future royalty proceeds. Instead, these paragraphs indicate that the "non-standard terms" included "non-standard rates for Tall Oak's Services" and paying revenue to Defendants in the form of earnouts. Docket No. 45, at ¶¶22, 27, 115, & 123-125. They do not allege how the rates were "non-standard" such that the Court could infer that Plaintiffs' royalties had been reduced. Accordingly, this Court found the second component was not satisfied and concluded Defendants failed to allege an entitlement to the earnouts under the terms of the oil and gas leases. Docket No. 67, at p. 12.

Plaintiffs also point to a single sentence in their response brief to the Second Motion to Dismiss in which they stated "Defendants *also* agreed to pay higher fees and receive lower prices than those offered under the Enable and Enlink contracts. The reason Defendants agreed to these inferior conditions was because both the GGPA and the PSA provided for revenue to be paid to Defendants based upon the volume of natural gas production." Docket No. 65, at p. 5. (italics in original). Although this information may raise the inference that Plaintiffs' royalties were reduced, the First Amended Complaint did not contain this information. As such, the Court finds no reason to alter or amend its judgement on this basis.

### IV.    Leave to Amend

Generally, where judgment has been entered and a case dismissed, leave to amend is not freely given. *See The Tool Box, Inc. v. Ogden City Corp.*, 419 F.3d 1084, 1087-88 (10th Cir. 2005) ("even though Rule 15(a) states that 'leave [to amend] shall be freely given when justice so requires,' 'this presumption is reversed in cases, such as here, where a plaintiff seeks to amend a complaint after judgment has been entered and a case has been

14

dismissed.'") (alterations in original) (quoting Fed. R. Civ. P. 15(a) & *Bressner v. Ambroziak*, 379 F.3d 478, 484 (7th Cir. 2004)).

However, in a recent unpublished opinion the Tenth Circuit indicated it "agree[s] with the Seventh Circuit that 'Rule 15(a)(2) provides the standard for evaluating post-judgment motions for leave to amend in situations, like this one, where a district court enters judgment at the same time it first dismisses a case.'" *Yellow Corp. v. Int'l Bhd. Of Teamsters*, 2025 WL 3089412, at *5 (10th Cir. Nov 5, 2025) (unpublished) (quoting *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1033 (7th Cir. 2024)). And, although plaintiffs are "still required to file under Rule 59(e) as a procedural mechanism [for relief], the standard for granting the motion is set by Rule 15(A)(2)[, and] . . . '[r]efusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments allowed previously, or futility of amendment.'" *Id.* (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)).

In *Yellow Corp.*, the Tenth Circuit found that the district court erred in denying the plaintiffs leave to amend because there were no signs of undue delay, undue prejudice, bad faith, dilatory motive, or failure to cure deficiencies by amendments previously allowed despite Plaintiff having filed one previous amendment and the district court finding no basis to reconsider entry of its judgment. *Id.* The Tenth Circuit noted, because the plaintiffs had requested leave to amend their complaint based on new evidence produced to them through discovery, the case before it was "not a case '[w]here the party seeking amendment kn[ew] or should have known of the facts upon which the proposed amendment is based

but fails to include them in the original complaint[.]'" *Id.* (quoting *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1236 (10th Cir. 2020)).

Defendants argue Plaintiffs should not be granted another opportunity to amend because amendment is futile and Plaintiffs could have included the allegations they seek to add now in their First Amended Complaint. To the extent Defendants maintain amendment is futile, the Court disagrees. With the additional factual allegations delineating the "non-standard terms" and indicating that Plaintiffs' royalties were reduced, the proposed second amended complaint states a right to the earnouts, under the second component discussed above set forth in *Watts v. Atl. Richfield Co.*, 115 F.3d 785 (10th Cir. 1997), *i.e.*, Plaintiffs would be entitled to, at least, "a *commensurate* portion of the [earnouts] that is *attributable to price reductions* applicable to future production[.]" 115 F.3d at 793 (internal quotations omitted) (emphasis added). To the extent dismissal may still be warranted on other grounds or Plaintiffs' claims may be pared down, such arguments are more appropriately addressed on a motion to dismiss or a motion for summary judgment.

The Court does agree with Defendants that, unlike the plaintiffs in *Yellow Corp.*, the Plaintiffs here knew or should have known of the facts upon which their proposed amendment is based. Nonetheless, inasmuch as the Tenth Circuit has indicated that leave to amend should be given freely where judgment is entered simultaneously with an order granting dismissal, the Court hereby grants Plaintiffs leave to file the Second Amended Complaint [Docket No. 69-1] as attached to Plaintiffs' Rule 59(e) Motion to Alter or Amend Judgment and Brief in Support [Docket No. 69].

In sum, despite finding no basis to alter or set aside its judgment under Rule 59(e), the Court grants Plaintiffs' alternative request to file a second amended complaint and hereby vacates the December 18, 2025, judgment.

### CONCLUSION

Accordingly, Plaintiffs' Rule 59(e) Motion to Alter or Amend Judgment and Brief in Support is hereby GRANTED IN PART to the extent it requests Plaintiffs be permitted leave to file an amended complaint and DENIED IN PART to the extent it requests the Court alter or amend its judgment based on misapprehensions of fact, a party's position, or law.

The judgment entered by this Court on December 18, 2025, in favor of Defendants and against Plaintiffs is hereby VACATED. Plaintiffs shall file their Second Amended Complaint as it is attached to their Motion to Alter or Amend Judgment and Brief in Support [Docket No. 69-1] by or before Friday June 12th, 2026. Failure to timely file the Second Amended Complaint will result in the reinstatement of the vacated judgment. Absent extraordinary circumstances, no further amendments will be permitted.

IT IS SO ORDERED this 9th day of June 2026.

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**